## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

ALFREDO LEWIS,

                           Plaintiff,

        vs.                                9:15-CV-55
                                                     (MAD/ATB)

DAVID MARTINEZ, et. al.,

                          Defendants.

---

ALFREDO LEWIS, Plaintiff, pro se
MELISSA A. LATINO, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

### ORDER and REPORT-RECOMMENDATION

## I.   <u>Background and Procedural History</u>

Plaintiff originally filed this action on July 7, 2014, in the Southern District of New York. (Complaint ("Compl.") (Dkt. No. 1). In his original complaint, plaintiff sued various "John Doe" officers at Ulster Correctional Facility ("Ulster"), alleging that they "sexually assaulted" him during a strip frisk on June 24, 2014. (*See generally* Compl.) Plaintiff's original complaint also named Officers "Martinez" and "Harris," who worked at Downstate Correctional Facility ("Downstate"), alleging that they denied plaintiff food and a working toilet on June 25-26, 2014, after his transfer from Ulster to Downstate. (*Id.*)

On October 6, 2014, Chief Southern District Court Judge Loretta Preska conducted an initial review of plaintiff's complaint. (Dkt. No 7). In her order, Judge Preska dismissed the complaint with prejudice against defendants Ulster and Downstate Correctional Facilities, based on the Eleventh Amendment. (Dkt. No. 7 at 3-4). Judge Preska also ordered plaintiff to submit an amended complaint with respect to the

excessive force/sexual assault claim. (*Id.* at 5-7).  In response to Judge Preska's order, on December 16, 2014, plaintiff submitted an amended complaint ("AC"), in which he repeated his conditions of confinement claims against Downstate officers Martinez and Harris and his sexual assault claims against the Ulster officers. (Dkt. No. 11).

After reviewing the amended complaint, on January 16, 2015, Judge Preska ordered this action transferred to the Northern District of New York. (Dkt. No. 17).  On May 8, 2015, Northern District Judge Mae A. D'Agostino conducted her initial review of the original complaint and the amended complaint, ordered that the two complaints be read together and that a copy of the original complaint be filed as an exhibit to the amended complaint,[1] ordered service of the complaints on defendants Martinez and Harris, and ordered service on the Attorney General of the State of New York so that plaintiff could be provided assistance in identifying the "John Doe" defendants, pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d. Cir. 1997) (per curiam).[2] (*Id.* at 7-9).

Judge D'Agostino ordered that, once the *Valentin* information was provided to plaintiff, the amended complaint would be deemed amended to reflect the full names of the identified John Doe defendants, the Clerk would be directed to edit the docket accordingly, and the amended complaint would then be served on the newly identified defendants. (Dkt. No. 17 at 9).  To the extent that the some of the John Doe defendants could not be identified through the *Valentin* information, plaintiff would be provided

---

[1] Judge D'Agostino also ordered that Ulster and Downstate Correctional Facilities be dismissed again because plaintiff had failed to remove these defendants from the caption of the complaint. (Dkt. No. 17 at 9-10).

[2] *See also*, *Garraway v. Griffin*, No. 12-CV-0924, 2013 WL 2105903, at *4-5 (W.D.N.Y.  May 8, 2013); *Rushion v. Fuller*, No. 13-CV-4277, 2013 WL 5406602, at *5 (E.D.N.Y. Sept. 25, 2013); and *Woodward v. Perez*, No. 12-CV-8671, 2014 WL 4276416, at *1 n.1 (S.D.N.Y. Aug. 29, 2014).

the opportunity to learn the identity of the John Doe defendants through discovery. If the Does could be identified through discovery, plaintiff would then have the opportunity to move to amend the amended complaint to name those John Doe defendants and have them served with process. (Dkt. No. 17 at 9-11).

On July 30, 2015, Assistant Attorney General ("AAG") Bruce Boivin responded to Judge D'Agostino's *Valentin* order. (Dkt. No. 24). AAG Boivin attached, to his letter, copies of pages from the Ulster Special Housing Unit ("SHU") Log Book, dated June 24-25, 2014 and the Ulster Draft Area Log Book, dated June 25, 2014. (Dkt. No. 24-2). These Log Book pages identify officers who were on duty in the Draft area and in the SHU on the above dates. AAG Boivin also stated that there were no Unusual Incident, Use of Force, or Misbehavior Reports related to plaintiff for his time at Ulster. (Dkt. No. 24). On August 26, 2015, plaintiff filed a letter, stating that he viewed the records, provided to him, but was apparently unable to identify the "officer who held the knight [sic] stick," although he could "definitely" identify the officer "by picture." (Dkt. No. 25 at 2).

In addition to the problems identifying the John Doe defendants, the Marshal was unable to serve defendants Martinez and Harris because there were multiple officers at Downstate with the same last names. (Dkt. Nos. 21, 28).[3] On April 12, 2017, I issued an order, noting that AAG Boivin had provided some information regarding the

---

[3] Dkt. No. 28 is a letter from the clerk to Deputy Counsel of the Department of Corrections and Community Supervision ("DOCCS"), Nancy Heywood, dated February 17, 2017, informing her that the Marshal had not been successful in serving defendants Martinez and Harris. The clerk attached a page from plaintiff's amended complaint in which he provided physical descriptions of the defendants and requested Deputy Counsel Heywood's assistance in determining first names and addresses for the individuals.

defendants' identities, but plaintiff was still unable to determine who the appropriate

defendants were. (Dkt. No. 30 at 4).  I directed defense counsel to further assist in

identifying defendants Martinez and Harris and directed that the Clerk of the Court add

the Superintendent of Ulster as a defendant for purposes of discovery relating only to

the John Doe defendants at Ulster.[4] (Dkt. No. 30).  I stated that, once the

Superintendent was served, plaintiff could seek the identities of the John Does "through

discovery." (*Id.* at 4).

On May 18, 2017, AAG Melissa A. Latino[5] provided a status report regarding the

possible identities of defendants Martinez and Harris. (Dkt. No. 36).  Based on defense

counsel's letter, I ordered service on defendant "David Martinez."  However, defense

counsel stated that there were two officers named "Harris."  One was not working in

plaintiff's unit on the day in question, and Dorrn Harris, who was working in the

plaintiff's unit, was no longer employed by DOCCS. (*Id.*)  I ordered the Clerk to send

plaintiff a copy of defense counsel's status report so that plaintiff could decide whether

the "Officer Harris," described by defense counsel in her letter, was the officer to whom

plaintiff was referring in his original and amended complaints, so that Harris could be

served with process if appropriate. (Dkt. No. 37).  Plaintiff was directed to inform the

---

[4] Plaintiff had been transferred to another facility, and it would have been difficult for him to
ascertain the names of the John Doe defendants at Ulster from a different facility. (Dkt. No. 30 at 5).
The court ordered that the Superintendent of Ulster continue as a defendant until plaintiff was given the
opportunity to conduct discovery related to the identity of the Doe defendants. (Dkt. No. 30 at 5 n.4)
(citing *Murphy v. Goord*, 445 F. Supp. 2d 261, 266-67 (W.D.N.Y. 2006) (refusing to dismiss the
Elmira Superintendent, despite the lack of allegations establishing personal involvement and permitting
the plaintiff to proceed with discovery to ascertain the identities of John Doe defendants)).

[5] AAG Latino was assigned to this action after service of the amended complaint on defendant
Martinez.

court of his decision. (*Id.*) Defendant David Martinez acknowledged service and subsequently filed an answer to the complaint. (Dkt. Nos. 41, 43).

On July 25, 2017, I issued a text order, reminding plaintiff of his responsibility to inform the court of his decision regarding defendant "Harris," and reminding plaintiff that his failure to serve a defendant or defendants could result in dismissal of his case against the unserved defendant(s). (Dkt. No. 45). On the same day, I issued a Mandatory Pretrial Scheduling Order ("PTSO"), inter alia, setting deadlines for Joinder and Amendment; Discovery; and Motions. (Dkt. No. 46).

On September 5, 2017, plaintiff filed a "Motion for Discovery," asking the court to order a "line up" so that plaintiff could identify the unknown officers and giving a physical description of defendant Harris. (Dkt. No. 48). The court denied plaintiff's motion as premature because the deadline for defense counsel to provide plaintiff with "initial disclosures" had not expired. (Dkt. No. 49). The initial disclosures could assist plaintiff in identifying the unknown defendants. Thus, plaintiff was directed to wait until the defendants provided their initial disclosures, or the time for providing plaintiff with such disclosures expired. (*Id.*) Once the initial disclosures were provided to plaintiff, he could review the documents and determine whether he needed additional discovery. If so, plaintiff was instructed to contact defense counsel to request such discovery before involving the court. (*Id.*)

On October 2, 2017, defense counsel filed a notice, stating that 157 pages of initial disclosures had been served on plaintiff. (Dkt. No. 50). Pursuant to the PTSO, the deadline for Joinder and Amendment expired on November 28, 2017, and the deadline for discovery expired on January 29, 2018. (Dkt. No. 46 at 5). Defendants

filed this motion for summary judgment on March 26, 2018. (Dkt. No. 51).  On April 16, 2018, plaintiff filed his response in opposition to defendants' motion. (Dkt. No. 55).  Although, on April 24, 2018, plaintiff requested, and was granted, permission to supplement his response to defendants' motion by May 11, 2018, he did not do so. (Dkt. No. 57).  On May 4, 2018, this court's Text Order granting plaintiff permission to file a supplemental response was returned as undeliverable, with a notation that plaintiff had been released from incarceration. (Dkt. No. 58).  The court sent plaintiff a copy of the updated docket sheet to his new address. (Dkt. No. 59).  Defendants filed their reply on May 24, 2018. (Dkt. No. 60).

## II.    Facts

Plaintiff alleges that he was transferred from Rikers Island to Ulster on June 24, 2014. (Compl. ¶ II(D) & CM/ECF p.8; AC ¶ II(D)).  Plaintiff alleges that he had permission to keep his hair long. (*Id.*)  Plaintiff claims that this permission was in the form of an "order."[6]  Plaintiff states that, when it came time to take his identification photo, a female corrections officer asked plaintiff to "pull out" his hair, but compliance with this request took time.  The female officer allegedly got into an argument with a male officer, who was supposed to escort plaintiff to another part of the facility.  Allegedly, because of this argument, plaintiff did not have his picture taken and the Office of Mental Health ("OMH") staff member, who was supposed to interview plaintiff, left the room. (*Id.*)  As a result, plaintiff claims that he was taken to the Special Housing Unit ("SHU"), where he was strip frisked before admission. (*Id.*)

---

[6] In the AC, plaintiff refers to this as a "hair cut order," but it is clear that he means to state that the officers were not to cut his hair.

Plaintiff claims that, during this strip frisk, as plaintiff was told to bend over, one of the officers ran his baton, down plaintiff's back, and down and in between his naked buttocks. (*Id.*)  Plaintiff then had a verbal exchange with the officer, who told plaintiff that if he thought he was "tuff [sic]," the officer would "shove it up [his] ass." (Compl. at CM/ECF 9).  Plaintiff stated that he tried screaming, but he was pushed around and taken to an empty cell.  He was transferred to Downstate the next morning - June 25, 2014. (*Id.*)

Plaintiff alleges that when he arrived at Downstate, he was placed in another empty cell, where the toilet did not work, and he did not eat "the whole day." (*Id.*) Plaintiff states that after he was "cleared," at 4:00 p.m. on June 26, 2014, he was placed in another cell.  In his amended complaint, plaintiff claims that defendant Martinez was the officer at Downstate who failed to provide plaintiff food or a working toilet while he was in the reception cell. (AC at CM/ECF p.8).  In his amended complaint, plaintiff also names "Officer Harris" as the individual who "denied [plaintiff] food for no reason." (*Id.*)  In both of plaintiff's complaints, he indicates that he does not know who was responsible for the alleged sexual assault, but in the amended complaint, he includes physical descriptions of the four "John Doe" defendants.  In his original complaint, plaintiff alleged that he was afraid to speak with anyone about "this from being put in the box to the sexual assault," and that he feared for his life. (Compl. at CM/ECF p.9).

## III.  **Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

IV.    **Exhaustion of Administrative Remedies**

A.    **Legal Standards**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations

governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).  There is also a special section for complaints of harassment. *Id*. § 701.8.  Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016).  "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857).  Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid.  The court in

*Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 2016 WL 4572321 at *2. Defendants bear the burden of proving the affirmative defense of failure to exhaust. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

### B.    Application

#### 1.    Defendant Martinez

Plaintiff has failed to exhaust his claims against defendant Martinez, the only defendant who has been served. Defense counsel has filed the declarations of Melissa Pickett, the Inmate Grievance Program Supervisor ("IGPS") at Downstate and Rachael Seguin, the Assistant Director of the Inmate Grievance Program ("IGP"). (Pickett Decl. (Dkt. No. 51-3), Seguin Decl. (Dkt. No. 51-2)). IGPS Supervisor Pickett states that plaintiff's claims against defendant Martinez - lack of food and a working toilet on June 25, 2014 and June 26, 2014- are claims that may be brought administratively through the IGP. (Pickett Decl. ¶¶ 7, 8). IGPS Pickett is responsible for keeping records of grievances filed by inmates at the Downstate "facility level." (Pickett Decl. ¶ 10). IGPS Pickett states that, although Downstate had a "fully functioning" grievance procedure, plaintiff did not file any grievances regarding his food and toilet claims during the time that he was incarcerated at that facility in 2014.[7] (Pickett Decl. ¶¶ 9-12).

---

[7] IGPS Pickett states that she conducted a search of the IGP files for the time period in question to arrive at her determination. (Pickett Decl. ¶ 11).

Assistant IGP Director Seguin states that she is the custodian of CORC records for DOCCS. (Seguin Decl. ¶ 2). She also confirms that DOCCS provides an "expedited procedure" for the review of grievances alleging harassment by DOCCS employees. (Seguin Decl. ¶ 7). Assistant IGP Director Seguin states that DOCCS maintains grievance files for the current year and for the previous four calendar years, and the data base contains records of all appeals of grievances that are received from the facility IGP Supervisor, including those that were reviewed under the expedited procedure.[8] (Seguin Decl. ¶¶ 8-9).

Assistant IGP Director Seguin confirms that plaintiff's allegations regarding the food and the toilet at Downstate are proper subjects for a grievance under the above-described grievance procedure. (Seguin Decl. ¶ 11). She states that all inmates, including those in the Special Housing Unit ("SHU") have access to the grievance procedure and may pursue their appeals to the CORC. (Seguin Decl. ¶ 13). She has searched the CORC records and has determined that plaintiff filed two grievance appeals to the CORC. (Seguin Decl. ¶ 14).

The first is Grievance SHG-29700-15, "Staff Retaliation," and the second is Grievance LIV-12460-18, "Inappropriate Frisk/PREA." (Seguin Decl. ¶ 14 & Ex. A). Grievance SHG-29700-15, "Staff Retaliation," was filed at Shawangunk Correctional Facility on August 18, 2015, and the appeal was received by the CORC on May 24, 2016. (Seguin Decl. ¶ 15). Grievance LIV-12460-18, "Inappropriate Frisk/PREA" was filed at Livingston Correctional Facility on January 2, 2018, and the appeal was

---

[8] Assistant IGP Director Seguin states that the data base also contains historical data with respect to CORC appeals, dating back to 1986, including data on many individual appeals. (Seguin Decl. ¶ 9).

received by the CORC on January 30, 2018. (Seguin Decl. ¶ 16).  No other appeals from any other grievances filed by plaintiff were received by the CORC, and neither of the appeals mentioned above related to any complaint regarding the conditions of confinement at Downstate from June 25, 2014 to June 26, 2014. (Seguin Decl. ¶ 17).

Thus, defendant has shown that there is no question of fact regarding plaintiff's failure to either bring a grievance and/or appeal the denial of a grievance with respect to his claim that defendant Martinez denied him a working toilet and food for one day while plaintiff was incarcerated in the "reception" area of Downstate.  Plaintiff's response does not raise any issues of fact.  He devotes most of his response to the merits of his claims, and alleges that defense counsel is "using" the grievance process to "back up" the defendant's "foul acts." (Dkt. No. 55 at 7).

Plaintiff's statement that, "when this situation took place,"[9] he was unaware of the "sequence" does not excuse his failure to exhaust. *See Cuello v. Lindsay*, No. 09-CV-4525, 2011 WL 1134711, at *9 (E.D.N.Y. Mar. 25, 2011) (ignorance of the law in general is insufficient to excuse exhaustion); *Tackman v. Goord*, No. 99-CV-438A, 2005 WL 2347111, at *31 (W.D.N.Y. Sept. 26, 2005).  Plaintiff does not claim that his ignorance was due to ambiguous language in the regulations, making the grievance procedure "unavailable." *See Hurst v. Mollnow*, No. 9:16-CV-1062, 2018 WL 4178226, at *8 (N.D.N.Y. July 20, 2018) (citing *Ross*, 136 S. Ct. at 1859-60), (Rep't-Rec), *adopted*, 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018); *Williams v. Priatno*, 829 F.3d

---

[9] Plaintiff makes this argument in his response to the summary judgment motion. (Dkt. No. 55 at 7).  It is unclear to which "situation" he is referring, but because both the alleged sexual assault and the conditions of confinement claims happened in the span of two days, the court will assume that plaintiff's argument was addressing both claims.

118 (2d Cir. 2016) (administrative remedies unavailable if the regulatory scheme providing for appeal is so opaque and confusing that the inmate could not use it). In addition, given the exhibits in this case, plaintiff does not, and cannot claim that any officer prevented him from filing a grievance.

Regardless of the merits of plaintiff's claims, he is still required to exhaust his administrative remedies prior to bring a civil rights action in federal court. Clearly, he did not do so with respect to defendant Martinez's (and defendant Harris's) alleged failure to give him food and a working toilet for one day. Generally, an inmate's failure to exhaust results in a dismissal without prejudice. Plaintiff in this case has been released from incarceration. If plaintiff *files* his action after his release from incarceration, the PLRA does not apply, and plaintiff would not be required to exhaust his administrative remedies. *See Prescott v. Annetts*, No. 09 Civ. 4435, 2010 WL 3020023, at *3-7 (S.D.N.Y. July 22, 2010) (citing *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004)). However, when plaintiff files his federal complaint while incarcerated and is thereafter released, the PLRA still applies after his release, even though plaintiff is no longer able to exhaust. *Id.* Therefore, in such a situation, the court must recommend dismissing with prejudice, particularly when plaintiff had "ample opportunity" to exhaust his administrative remedies prior to release. *Id.*

Although the court need not consider whether plaintiff exhausted his administrative remedies with respect to the allegedly improper strip frisk because none of the defendants who were allegedly involved in the incident have been served, the court will discuss exhaustion in case plaintiff considers moving to amend his amended complaint to substitute the appropriate parties.

14

Effective May 15, 2014, DOCCS amended their grievance policy to specifically exclude sexual abuse and sexual harassment complaints from the three-tiered grievance process. *See Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *3-4 (W.D.N.Y. March 14, 2016) (summarizing amended DOCCS policy). DOCCS Directive 4040 includes the same language quoted in *Henderson*:

> The Department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), **an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the Prison Litigation Reform Act (PLRA) exhaustion requirement** (42 U.S.C. § 1997e (a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below. For purposes of PREA Standards (28 C.F.R. § 115.52) and the exhaustion requirement, any allegation concerning an incident of sexual abuse or sexual harassment (see Department Directives #4027A, "Sexual Abuse Prevention & Intervention - Inmate-on-Inmate," and #4028A, "Sexual Abuse Prevention & Intervention - Staff-on-Inmate") shall be deemed exhausted if official documentation confirms that:
>
> > (1) An inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of Special Investigations; or
> >
> > (2) A third party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation.

(*Id*. at 52) (emphasis added).

In this case, it is clear from defendant's documents that plaintiff did not file a formal grievance with respect to the alleged sexual assault. However, plaintiff has

attached documents to his response to defendant's motion for summary judgment which
would support plaintiff's allegation that he did file some sort of complaint regarding the
improper strip frisk. (Dkt. No. 55, Exh. 2).  The documents consist of two memoranda
to Sergeant Hodes at Ulster, one from R. Cruz and the other, from C.O. Firester. (Pl.'s
Ex. 2 at 11, 12).  The memoranda appear to be part of an inquiry by Sergeant Hodes
into plaintiff's allegations of sexual abuse during the June 24, 2014 strip frisk. (*Id.*)  As
an exhibit to plaintiff's deposition, defendant attached a memorandum from Sergeant
Wiand to Lieutenant Daniels at Downstate Correctional Facility, dated July 3, 2014,
referring to an investigation of plaintiff's allegations. (Dkt. No. 51-1 at 42). The
memoranda are dated in July of 2014, shortly after plaintiff's transfer to Downstate.
These memoranda show that plaintiff did comply with the amended directive, and that
he did complain about the allegedly improper strip frisk.  Thus, plaintiff was not
required to exhaust the three-tier grievance process in order to bring this action.
However, because plaintiff has failed to identify any of the John Doe defendants, the
case may not proceed.

## V.    **Conditions of Confinement**

### A.    **Legal Standards**

The Eighth Amendment protects prisoners from "cruel and unusual punishment"
in the form of "unnecessary and wanton infliction of pain" at the hands of prison
officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97,
104 (1976);  *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000).  The constitutional
prohibition against cruel and unusual punishment includes the right to be free from
conditions of confinement that impose an excessive risk to an inmate's health or safety.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference.  *Id*.

### B.    Application

Although it is not necessary to reach the merits of the claims against defendant Martinez because plaintiff failed to exhaust his administrative remedies, the court will note that plaintiff's allegations against defendant Martinez would also fail on the merits.  "Under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."  *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983) (citations omitted).

### 1.    Food

In this case, plaintiff alleges that he was denied food from the time that he arrived at Downstate until the next day at 4:00 p.m., when he was cleared and transferred to another cell.  When plaintiff arrived at Downstate, he was housed in the Forensic Diagnostic Unit ("FDU"), a special housing unit staffed by OMH along with DOCCS. (Martinez Decl. ¶ 5).  An inmate housed in the FDU is under observation, and both OMH and DOCCS staff conduct periodic rounds of the inmates' cells. (*Id.*)  According to the Log Book for the FDU, plaintiff was admitted on June 25, 2014 at 4:12 p.m. (Martinez Decl. ¶ 9; Latino Decl. Ex. A at CM/ECF p.10 (Log Book entries)).  On June 25, 2014, defendant Martinez worked the 7:00 a.m. to 3:00 p.m. shift in the FDU, and he worked the same shift on June 26, 2014.  Thus, defendant Martinez was not on duty when plaintiff was admitted to the unit, and was not on duty until the next morning at 7:00 a.m. (Martinez Decl. ¶ 7).  Defendant Martinez also states that he would not have any reason to stay on the unit past the end of his shift, and he did not work overtime on either June 25th or the 26th. (Martinez Decl. ¶ 7).

When defendant Martinez was on duty on June 25th and 26th, he was the First Officer, whose duties were processing admissions into the FDU, monitoring inmates placed on special watch, performing security searches, distributing and collecting feed trays, supplying inmates with necessities such as toilet paper and toothpaste, and escorting inmates to interviews and psychiatric evaluations to determine their status. (Martinez Decl. ¶ 8). The FDU Log Book indicates that plaintiff was initially placed in cell 1-D-15 and placed on "15 minute rounds," requiring DOCCS staff to check on plaintiff every 15 minutes. (Martinez Decl. ¶¶ 9, 10; Latino Decl. Ex. A at CM/ECF pp. 10, 11).

Defendant Martinez states that when he arrived for his shift on June 26th, plaintiff was locked into cell 1-D-19. (Martinez Decl. ¶ 11). This cell change had occurred at approximately 5:48 p.m. on June 25th. (*Id.*; Latino Decl. Ex. A at CM/ECF p.11) On June 26th, plaintiff was moved to a general population cell at approximately 1:25 p.m. (Martinez Decl. ¶ 12; Latino Decl. Ex. A at CM/ECF p.17). Thus, plaintiff was housed in cell 1-D-19 for less than one day - from 5:48 p.m. on June 25th until 1:25 p.m. on June 26th. Defendant Martinez would only have been responsible for plaintiff's conditions from 7:00 a.m. on June 26th until plaintiff's transfer to general population at 1:25 p.m. on the same day. (Martinez Decl. ¶¶ 14, 15).

Defendant Martinez also states that the Log Book reflects that lunch trays were served at 11:45 a.m. on June 26th, and that although the inmate locked into cell 1-D-15 (plaintiff's previous cell) refused his lunch tray, there is no indication that plaintiff refused his food. (Martinez Decl. ¶ 17; Latino Decl. Ex. A at CM/ECF p.16). Defendant Martinez states that such a refusal would be documented in the Log Book

19

because the eating patterns of inmates who are on special watch are monitored in case an inmate begins a hunger strike. (Martinez Decl. ¶¶ 16-17).  In addition, defendant Martinez was responsible for inspecting the inmates' food trays in case an inmate failed to eat his food, and he would certainly have noticed in any inmates had not received food trays. (Martinez Decl. ¶¶ 18-19).  Finally, with respect to the food issue, defendant Martinez states that on June 26th, plaintiff Lewis never complained to him that he had been denied any meals on either day. (Martinez Decl. ¶ 21).

Although complete denial of food or a claim that the food provided to an inmate was "inedible" could meet the objective prong of the Eighth Amendment analysis, an "isolated withholding" of food does not rise to the same level. *See Brogdon v. City of New York*, No. 16-CV-8076, 2018 WL 4762981, at *11 (S.D.N.Y. Aug. 8, 2018) (citing inter alia *Little v. Municipal Corporation*, 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014) (objective prong not met where plaintiff only alleged "isolated" withholding of food rather than a deprivation of the "measure of food necessary to maintain health")).  At worst, plaintiff was without food for less than 24 hours, and defendant Martinez was only on duty and responsible for bringing the food trays for less than one day.[10]  Thus, defendant has shown that there is no question of fact regarding a deprivation of food during plaintiff's short stay in the FDU that would support an Eighth Amendment cause of action against either defendant Martinez or defendant Harris, had he been served.

### 2.    Toilet

The same is true for plaintiff's allegation that he was denied a "working toilet."

---

[10] In order to be liable for a constitutional violation, the defendant must be "personally involved." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).

Plaintiff has not shown that the duration and severity of his experience was sufficient to meet the objective prong of the Eighth Amendment test.  As stated above, defendant Martinez was not working when plaintiff was admitted to the FDU on June 25th.  Thus, he could not have been responsible for plaintiff's toilet.  In fact, plaintiff alleges that defendant Martinez tried to help him with the toilet, and that he told plaintiff to "press hard enough on the button." (Martinez Decl. ¶ 23; Pl.'s Dep. at 57-58).  Plaintiff also testified during his deposition that defendant Martinez entered his cell to try to flush the toilet, but that it still did not flush. (*Id.*)

Defendant Martinez also states that the toilets in the FDU have a safety valve to prevent inmates from flooding their cells. (Martinez Decl. ¶ 24).  If a toilet is flushed more than twice within 20 minutes, the toilet will not flush again for 30 minutes. (*Id.*)  This function may have contributed to plaintiff's problem.  In any event, plaintiff was transferred out of the FDU by 1:25 p.m.  Thus, plaintiff allegations do not meet either the objective or the subjective prongs of the Eighth Amendment test.[11]  Thus, even if plaintiff had exhausted his administrative remedies, the court would still recommend dismissal of his condition of confinement claims.

---

[11] Defendant Martinez also states that before an inmate is placed in a particular cell, the officers perform a security check, which includes determining whether the running water and the toilet are functional. (Martinez Decl. ¶¶ 26-27).  Defendant Martinez was not on duty when plaintiff was admitted, so he did not perform the security check on either of the cells in which plaintiff was housed on June 25th. (Martinez Decl. ¶ 28).  Defendant Martinez also states that he did not become aware of a problem with plaintiff's toilet on June 26th, or he would have put in a maintenance request and contacted the Movement Control Officer to have had plaintiff moved to another cell. (Martinez Decl. ¶ 29).  A notation would have been made in the Log Book, but no such notation was made. (Martinez Decl. ¶ 30).  Finally, defendant Martinez states that he did not observe any condition of urgency in plaintiff's cell.  He did not observe feces or pools of urine on the floor or on the walls of his cell, nor did the toilets overflow in either of the cells in which plaintiff was housed. (Martinez Decl. ¶¶ 31-32).

## VI.    Unidentified/Unserved Defendants

### A.    Legal Standards

Using "Doe" in the place of a named defendant does not serve to "'sufficiently identify the defendant.'" *Epps v. City of Schenectady*, No. 1:10-CV-1101, 2013 WL 717915, at *4 (N.D.N.Y. Feb. 27, 2013) (quoting *Coward v. Town and Village of Harrison*, 665 F. Supp. 281, 300 (S.D.N.Y. 2009)).  When this action was filed, Fed. R. Civ. P. 4(m) authorized the court to dismiss an action, on motion, or on its own, after notice to the plaintiff, where the summons and complaint were not served on the party within 120 days after filing the complaint, absent a showing of good cause.[12] *Gray v. Harder*, No. 9:14-CV-1505, 2016WL 4708233, at *3 (N.D.N.Y. Aug. 9, 2016).  Upon a showing of good cause, the time for service must be extended,[13] and before dismissing suits against John Doe defendants, courts generally give the plaintiff an opportunity to learn the identities of the responsible individuals through discovery. *Epps, supra.* Where the plaintiff has had ample time to identify the John Does, he cannot continue to maintain the action against the unidentified defendant. *Id.*

### B.    Application

Defendant Martinez moved for summary judgment on his own behalf because he is the only defendant who has been served and who has appeared in this action. Counsel for defendant Martinez has also requested dismissal of the action against the unserved defendants. (Dkt. No. 51-6 at 12).  The court will, therefore, address the issue

---

[12] In 2015, the time period for service was reduced to 90 days after filing the complaint. Fed. R. Civ. P. 4(m).

[13] *Epps*, 2013 WL 717915 at *4. (citation omitted).

of defendant Harris and the "John Doe" defendants from Ulster who have also never been identified or served.  Plaintiff has been told several times that he must attempt to identify and serve the "John Doe" defendants and defendant "Harris."  Plaintiff has failed to do so, and the joinder and discovery deadline have expired.  Plaintiff has requested that the court hold a "lineup" so that plaintiff can identify the officers who he alleges participated in the "sexual assault" at Ulster and so that he can confirm which officer "Harris" he wishes to name from Downstate.

### A.    John Does/Strip Search at Ulster

As stated above, on July 20, 2015, in response to the *Valentin* order, plaintiff was provided the Log Book entries for the Ulster Draft Area and SHU for June 24-25, 2015. (Dkt. No. 24).  These entries identified officers who were "on duty" in those areas on those dates, and particularly when plaintiff was admitted to SHU.[14]  There is no indication in the Log Book entries of any of the officers performing a strip search on plaintiff, even though plaintiff's admission to the unit is reflected in the Log Book. (Dkt. No. 24-2 at 5).  The plaintiff was served with the defendants' mandatory disclosures on September 25, 2017. (Dkt. No. 50)  Plaintiff has never moved to amend his amended complaint to name any of the John Does, notwithstanding the *Valentin* information or the Mandatory Disclosure materials.

In his response to defendant's motion for summary judgment, plaintiff refers to memoranda, written to Sergeant Hodes by the officers who state that they were involved the plaintiff's strip search. (Dkt. No. 55-2 at 11-12).  One memorandum is

---

[14] Two of the officers who were on duty were CO Cruz and CO Firester. (*See e.g.* Dkt. No. 24-2 at 5).

from the officer who states he was outside the room during the frisk, and another from the officer who states that he conducted the strip search and who claims that he never touched the inmate with his baton. (Dkt. No. 55-2 at 12). Plaintiff states that Officer Firester "stated . . . C.O. R. Cruz performed the strip frisk on inmate Lewis," although Officer Fierster was not in the room when the frisk was performed. (Dkt. Nos. 55 & 55-2 at 11). The date on Officer Firester's memorandum is July 10, 2014. (*Id.*)

Plaintiff also cites a memorandum written by Officer Cruz, who states that he performed the strip frisk on plaintiff, but that he never touched plaintiff's buttocks during the search. (Dkt. No. 55–2 at 12). Officer Cruz stated that he was not carrying a baton on duty, and that the frisk was conducted "without incident." (*Id.*)

It is unclear exactly where plaintiff obtained these documents, but the court can reasonably assume that they were part of the defendants' initial disclosures, which were served on plaintiff September 25, 2017. (Dkt. No. 50). These documents show that plaintiff complained about the alleged sexual assault at Ulster after he arrived at Downstate. The documents were referred to at plaintiff's deposition.[15] However, plaintiff did not move to amend his amended complaint to add either of these officers as defendants to replace John Doe defendants, and in fact, seems to claim in his response to the motion for summary judgment, that it was a different individual who committed the alleged sexual assault. (Dkt. No. 55 at 2-3). Plaintiff states that a "form" would pinpoint who the officer was, and "[t]he officer who transported me to the SHU committed the sex act." (*Id.*) It does not appear from Officer Cruz's memorandum that

---

[15] Plaintiff's deposition was taken on October 8, 2017 and January 8, 2018. (Dkt. No. 51-1 at CM/ECF p.21-48, Def.s' Ex. B)

he was the transport officer. Thus, although plaintiff had copies of the memoranda in September of 2017, when he was served with the discovery documents, it is still unclear who plaintiff would name as a defendant or defendants.

The documents that plaintiff has filed with his response to the motion for summary judgment essentially identify the officer who conducted the strip search of plaintiff, although it appears from the documents that, at most, there were only two officers present at the time of the search in question. The court notes that Judge D'Agostino's order indicates that if the identity of the defendant(s) were determined through the *Valentin* order, the amended complaint would be "deemed amended to reflect the full names of the identified John Doe defendants." (Dkt. No. 17 at 9). However, if plaintiff obtained the information through discovery, he would be required to move to amend. (*Id.*) Because plaintiff has failed to move to amend his amended complaint, and the court cannot determine from plaintiff's papers whether he believes that any of the officers identified above were involved in the relevant search,[16] this court must recommend dismissing plaintiff's claims against the John Doe officers without prejudice[17] for failure to identify and serve the defendants. *See Gray, supra*

---

[16] Plaintiff's response to defendant's motion for summary judgment is confusing. While he mentions Officers Cruz and Firester, he also implies that there could have been another search conducted, during which the alleged sexual assault took place, and may or may not have involved Officers Cruz and/or Firester.

[17] The court notes, without deciding, that there could be a statute of limitations issue in identifying the John Doe defendants at this time. The incidents in this action are alleged to have occurred between June 24 and 26, 2014. The statute of limitations for a section 1983 claim is three years. *Owens v. Okure*, 488 U.S. 235, 250–51 (1989). *See* N.Y. Civ. Prac. L & R. § 214(5). Without considering whether the statue would be tolled for any reason, the three year statute of limitations would have run on June 26, 2017. If the statute has run, the only way that plaintiff would be allowed to now name additional defendants is if the substitution "relates back" to the original complaint. *Moore v. City of Norwalk*, No. 3:17-CV-695, 2018 WL 4568409, at *2 (D. Conn. Sept. 24, 2018) (citing Fed. R.

(where discovery is closed, and plaintiff has had ample time to identify and serve the John Doe defendants, but has failed to do so, dismissal is appropriate.

### 2.    Defendant Harris

Plaintiff was informed of the possible identity of defendant Harris by letter dated May 18, 2017, and was subsequently ordered to inform the court whether he wished to serve the Officer Harris who was working on plaintiff's housing unit. (Dkt. Nos. 36, 37). Plaintiff has never moved to amend his amended complaint with respect to this defendant. This court need not consider this defendant further because, as stated above, plaintiff failed to exhaust his conditions of confinement claim, and plaintiff would be unable to proceed as against defendant Harris on the merits of plaintiff's claim, in any event.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant **MARTINEZ'S** motion for summary judgment (Dkt. No. 51) be **GRANTED**, and the amended complaint (Dkt. No. 11) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES**, and it is

**RECOMMENDED**, that the amended complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE** as against **DEFENDANT HARRIS**, for failure to identify, and/or serve, and for failure to exhaust administrative remedies, and it is

**RECOMMENDED**, that the amended complaint be **DISMISSED IN ITS**

---

Civ. P. 15). However, there can be no relation back absent a mistake about the party's identity. *Id.* The Second Circuit has held that the lack of knowledge of a John Doe defendant's name does not constitute a "mistake of identity" to allow relation back. *Id.* (citations omitted). The failure to identify defendants when the plaintiff knows that the defendants must be named may not be characterized as a mistake. *Id.* (citing inter alia *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013)).

**ENTIRETY** as against all **John Doe** defendants **WITHOUT PREJUDICE** for failure to identify and/or serve and it is

 **ORDERED**, that this action be **TERMINATED** as against

**SUPERINTENDENT ROSEMARY WENDLAND** because service and discovery have been completed, pursuant to my April 12, 2017 Order, which added Superintendent Wendland "for purposes of service and discovery only." (Dkt. No. 30 at 4-6).

 Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: November 9, 2018

         *Andrew T. Baxter*
         Hon. Andrew T. Baxter
         U.S. Magistrate Judge